IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

SARAH JEAN DOUGLAS,              )
                                 )
    Plaintiff,                   )
                                 )
v.                               )   Civil Case No.: CV-04-415-BH-B
                                 )
STATE OF ALABAMA DEPARTMENT      )
OF MENTAL HEALTH AND MENTAL      )
RETARDATION, *et al.*            )
                                 )
    Defendants.                  )

**ORDER**

    This matter is before the Court on Defendants' Motion (Doc. 14) for Summary Judgment. Plaintiff has filed a Response (Doc. 19) in opposition to the Motion and Defendants have filed a Reply (Doc. 21) to Plaintiff's Response. Upon reviewing the above filings and all relevant evidence submitted therewith, the Court finds that Defendants' Motion (Doc. 14) for Summary Judgment is **due to be GRANTED**.

**FACTS**

1.   In 2003, Searcy Hospital was one of ten inpatient facilities operated by the Alabama Department of Mental Health and Mental Retardation (hereinafter, DMH/HR). The Claudette Box Nursing Facility (hereinafter, CBNF) was located on the Searcy Hospital campus and was part of Searcy Hospital. (McLean Aff. ¶2).

2.   Beatrice McLean, an African-American female, has been the Facility Director for Searcy Hospital since October 20, 2001 and she is the only person at Searcy with the authority to terminate an individual's employment. *Id*.

3.   On September 22, 2002, David Grimes, a Caucasian male, became administrator of CBNF until

its closure on August 31, 2003. *Id*.

4. Grimes became administrator of CBNF on September 22, 2002 after the facility came under the scrutiny of the Alabama Department of Public Health and U.S. Department of Justice for an allegation of patient abuse and tardy investigation occurring in March, 2002. *Id*. at ¶3.

5. In December, 2002, in an attempt to enhance the staff at CBNF, Lydia Williams, an African-American female, was detailed to the facility as supervisor of the CBNF therapeutic recreation/activity staff. Ms. Williams has been employed at Searcy Hospital since 1989 as a recreational therapist. She has a BS and MS degrees in Therapeutic Recreation from the University of South Alabama. (Russell Aff. ¶4; Williams Aff. ¶2).

6. Lydia Williams's immediate supervisor was Searcy Hospital's Director of Rehabilitative Services, Melcina Russell, an African-American female. (Russell Aff. ¶3).

7. While at CBNF, Williams remained under the formal supervision of Russell, but also worked under the functional supervision of Grimes. *Id*.

8. Plaintiff, Sarah Douglas, was hired for the position of Activity Aid I for CBNF on January 11, 2003. (Williams Aff. ¶4).

9. Williams was Plaintiff's rating supervisor and Russell and Grimes were her reviewing supervisors. (Russell Aff. ¶3).

10. Plaintiff was one of three activity aides under Williams's supervision. The other two were Takarra Craig, an African-American female, and Eda Harville, a Caucasian female. (Williams Aff. ¶11).

11. Plaintiff was hired on a probationary status with a probationary period of 6 months. (Tolbert Aff. ¶4).

12. Plaintiff attended and successfully completed her employee orientation prior to performing direct

care duties with patients. (Pl.'s Dep. p. 20-21; Williams Aff. ¶5).[1]

13. **Incidents of Reprimand**[2]

   a. After a CBNF Service Team meeting on January 29, 2003, Plaintiff was orally reprimanded by Williams for inappropriate laughter at a question posed by a patient. (Pl.'s Dep.(cont.) p. 8; Williams Aff., Ex. WA-1). Such behavior is in violation of DMH/MR's policy regarding respect for patient dignity. (Doc. 15, Ex. 10, Pl.'s Dep., Def. Ex. 5).

   b. Due to safety considerations for elderly patients, activity aides at CBNF were not permitted to carry bags or purses with them when performing therapeutic activities. (Doc. 15, Ex.11, Pl.'s Dep., Def. Ex. 10). Plaintiff, though instructed as to this policy, ignored the regulation on more than one occasion. (Pl.'s Dep.(cont.) p. 11; Def. Req. for Admis., Pl.'s Resp. to Req. for Admis. ¶¶ 6,7,8).

   c. On April 25, 2003, Williams issued a staff-wide memo reminding the Activity Staff at CBNF of the no bag/purse policy and why it was in effect. (Williams Aff., Ex. WA-2).

   d. On May 15, 2003, Williams issued a written reprimand to Plaintiff citing her failure to adhere to the no bag/purse policy. (Williams Aff., Ex. WA-3).

14. **Weekend Work Schedules**

---

[1] Plaintiff's Deposition commenced on February 18, 2005. At the request of Plaintiff's counsel, the deposition was continued until February 22, 2005. For the purposes of citation in this Order, the transcript for the earlier date will noted as "Pl.'s Dep." and the later date as "Pl.'s Dep. (cont.)."

[2] The Court's findings of fact are extracted from the relevant depositions and affidavits submitted by Defendants. Though she claims to dispute all of Defendant's factual statements concerning any criticisms of her work performance, Plaintiff has not submitted any evidence to contradict the documentation and properly sworn statements submitted by Defendants in support of their recitation of the facts.

    a.    Because it was necessary to provide coverage to the facility seven days per week, at least one of the activity staff members had to work on the weekend. (Williams Aff. ¶11).

    b.    Only one instance is noted in which Plaintiff was unhappy with the weekend scheduling. As a result of that complaint by Plaintiff on April 11, 2003, Williams and Russell met with Plaintiff. At that time, the schedule was amended to Plaintiff's satisfaction. (*Id.*; Pl.'s Dep., p. 96-102).

    c.    Plaintiff claims that after her meeting with Russell and Williams she felt as though her job performance was being scrutinized by Williams and that Williams threatened her by stating, "I will not show favoritism when I do your evaluation." (Pl.'s Dep., p. 97, 99).

15. **Report of Patient Abuse**

    a.    In the early afternoon of May 15, 2003, Mental Health Worker Michelle Williams and Activity Aide Takarra Craig told Lydia Williams that they had seen Plaintiff wake a patient who was sitting in a recliner by striking him in the back of the head. (Williams Aff. ¶7).

    b.    Lydia Williams directed Craig and Michelle Williams to speak with Grimes. *Id*.

    c.    Grimes ordered that the matter be investigated and immediately removed Plaintiff from direct patient care duties pending resolution of the allegation. (Grimes Aff. ¶7).

16. Because she was not permitted to have direct patient contact, Plaintiff was detailed to perform clerical duties at the Moorer Center. (Russell Aff. ¶7).

17. The Moorer Center is on the Searcy Hospital campus and houses the offices for some of Searcy's recreational and educational staff. (Collette Aff. ¶2).

18. **Patient Abuse Investigation**

    a.    The allegation made against Plaintiff was initially investigated by Annie Adams, Clinical

       Investigator. (Doc. 15, Ex. 10, Pl.'s Dep., Def. Ex. 8; Tolbert Aff. ¶7).

b.    On May 21, 2003, after Ms. Adams had completed her investigation, her report was reviewed by the Searcy Investigation Review Committee. (McLean Aff., Ex. MA-5).

c.    Adams concluded that the allegation was not substantiated and the investigation committee agreed. The committee concluded that Plaintiff most likely tapped the patient on the shoulder to awaken him, startling him and causing him to flinch. *Id*.

d.    Nevertheless, based on her existing record of inappropriate demeanor with residents at CBNF, the investigation committee recommended that Plaintiff not be returned to direct patient care duties. *Id*.

e.    The investigation report was then forwarded on to McLean. *Id*.

f.    McLean was not convinced that the abuse was unsubstantiated and requested additional information from the investigator and that a pre-disciplinary conference be set up. (McLean Aff. ¶4).

g.    A pre-disciplinary conference was scheduled for August 21, 2003 between Plaintiff and Eleanor Tolbert, Searcy Director of Human Resources. *Id*.; Tolbert Aff. ¶8.

h.    At this conference Plaintiff denied the allegation of abuse and asked to meet with McLean personally. *Id*.

i.    Plaintiff was granted a second pre-disciplinary conference that was set for September 29, 2003. *Id*.

j.    This conference was tape recorded and Plaintiff suggested that the abuse allegation was a retaliation for Plaintiff's earlier complaints about weekend scheduling. (McLean Aff., Ex. MA-7).

        k.        Plaintiff did not allege that the retaliation was race motivated, rather, it had to do with Craig's animosity towards her resulting from inconveniences with the scheduling. *Id*.

        l.        After personally meeting with Plaintiff, McLean directed that the investigation be closed with a finding that patient abuse not be substantiated. (McLean Aff. ¶11).

19.    **Probationary Employment Policy**

        a.        Pursuant to the State of Alabama Personnel Procedure Manual, all new employees are typically required to serve a six month probationary period at the beginning of their employment. (McLean Aff., Ex. MA-3)

        b.        The employee's work performance is evaluated and graded through a formal written "performance appraisal" process. *Id*.

        c.        The performance appraisal process is supposed to consist of 3 stages: a pre-appraisal session and report, a mid-appraisal session and report and a final probationary performance appraisal. *Id*.

        d.        If the employee receives a satisfactory score in the final performance appraisal, the employee is promoted to non-probationary status. Otherwise, the employee's probation may be extended or the employee may be recommended for termination. *Id*.

        e.        The pre-appraisal and mid-appraisal sessions are designed to make the employee aware of their work duties and responsibilities and give feedback as to their performance. The final appraisal is to grade the employee's performance over the entire probationary period. *Id*.

20.    On July 21, 2003, before the first pre-disciplinary conference regarding the patient abuse allegation was set up, Plaintiff's probationary performance appraisal was submitted to McLean for review.

(McLean Aff., Ex. MA-2)

21. Plaintiff's performance was appraised by Lydia Williams, her rating supervisor, and Melcina Russell, her reviewing supervisor. *Id*.

22. Based on that report, McLean claims she determined then that Plaintiff's employment should be terminated. (McLean Aff. ¶6).

23. As Tolbert notified McLean, Plaintiff's probationary performance appraisal should have been submitted prior to July 10, 2003, the end of Plaintiff's six month probationary period. *Id*.; McLean Aff., Ex. MA-3.

24. Under State Personnel Board rules, because the appraisal was not dealt with before the six month expiration date, McLean had no choice but to appoint Plaintiff to a permanent position or extend her probationary period for three months. (McLean Aff., Ex. MA-3)

25. McLean, because she had already decided to terminate Plaintiff, chose to extend the probationary period to October 10, 2003 rather than hire her on as a permanent Activity Aide. (*Id*. at Ex. MA-4).

26. Plaintiff did not receive either a timely pre-appraisal[3] or mid-appraisal session and report. (Def.'s Mot. Summ. J., at 10).

27. Defendants admit that it was in error that Plaintiff did not receive a timely pre-appraisal report or mid-appraisal report. *Id*.

28. Defendants also concede that they erred by not rendering Plaintiff's first performance appraisal on time. *Id*.

---

[3] Plaintiff does seem to have received a pre-appraisal report which appears to have been completed on the same day as her second probationary evaluation.

29. Plaintiff received her second performance appraisal at the end of her extended probationary period on September 24, 2003. (McLean Aff., Ex. MA-6).

30. Plaintiff's appraisal was prepared by Lydia Williams, her rating supervisor, and Melcina Russell, her reviewing supervisor. *Id*.

31. Plaintiff's second performance appraisal was approved on October 2, 2003 by McLean. *Id*.

32. On October 3, 2003, McLean advised Plaintiff of her termination based on the unsatisfactory score on her second performance appraisal. (*Id*. at Ex. MA-8).

33. McLean determined that Plaintiff had not met the standards for employment as an Activity Aide because: she had only been able to perform as an Activity Aide from January until May, she had been reprimanded for laughing at a patient and she had been reprimanded several times for violating the policy of not carrying bags while performing therapeutic duties. (McLean Aff. ¶13).

34. Though Plaintiff's performance of clerical duties had been acceptable, McLean felt as though Plaintiff could not adequately perform the duties of Administrative Aide. *Id*. at ¶14.

35. Plaintiff filed a complaint with the EEOC on October 24, 2003. (Doc. 15, Ex. 11, Def. Ex. 17).

36. Plaintiff filed a complaint with this Court on June 24, 2004. (Complaint, Doc. 1)

37. On June 28, 2004, Searcy Hospital hired an Activity Aide, Janet Mitchell, an African-American female. (Def.'s Resp. to Pl.'s Interrog. #15).

38. Plaintiff alleges Defendants DMH/HR, Searcy Hospital, Lydia Williams and Melcina Russell terminated her on the basis of her race in violation of Title VII of the Civil Rights Act of 1964 (hereinafter, Title VII). (Complaint, ¶13).

39. Plaintiff further claims that DMH/MR and Searcy Hospital have knowingly engaged in a pattern or practice of reverse race discrimination favoring African-American employees regarding

employment practices. *Id*. at ¶14.

40. Plaintiff also alleges that her termination was in retaliation for exercising her federally protected right to voice complaints regarding discriminatory job treatment. *Id*. at ¶16.

**LEGAL ANALYSIS**

**I.      Summary Judgment Standard**

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. *Hickson Corp. v. N. Crossarm Co., Inc.,* 357 F.3d 1256, 1259 (11th Cir. 2004) (citing *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id*. A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*.

The moving party bears "the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmoving party bears the burden of proof at trial, the moving party may discharge its "initial responsibility" by showing that there is an absence of evidence to support the nonmoving party's case or by showing that the nonmoving party will be unable to prove its case at trial. *United States v. Four Parcels of Real Property*, 941 F.2d 1428,

1437-38 (11th Cir. 1991). To survive summary judgment, the nonmoving party bearing the ultimate burden of proof at trial must then come forward with evidence sufficient to withstand a directed verdict motion. *Fitzpatrick v. Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993).

On summary judgment, "the district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences ... in his favor." *Four Parcels*, 941 F.2d at 1428 (internal quotations and citations omitted).

## II. Plaintiff's Claims

As put forth in the Complaint, Plaintiff alleges that Defendants have violated her rights pursuant to Title VII by engaging in reverse race discrimination and retaliation. However, in her Response (Doc. 19) to Defendants' Motion for Summary Judgment, Plaintiff concedes that the claim of retaliation and all claims against the individual defendants Lydia Williams and Melcina Russell are due to be dismissed. The Court agrees. Therefore, the portion of Defendants' Motion for Summary Judgment relevant to those claims is **due to be GRANTED**.

With the dismissal of the above claims, Plaintiff acknowledges that she is only left with her allegations of reverse race discrimination (more properly characterized as "disparate treatment") against State of Alabama DMH/MR as proffered in Count I of Plaintiff's Complaint. However, in the Complaint Plaintiff also asserts that Defendants DMH/MR and Searcy Hospital have engaged in a pattern and practice of reverse discrimination.[4] As this Circuit has held, "a pattern and practice claim either may be brought by the EEOC if there is 'reasonable cause to believe that any person or group of persons is engaged in a

---

[4] There are two theories of intentional discrimination under Title VII: disparate treatment and pattern or practice discrimination. *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000).

pattern or practice' of discrimination, or by a class of private plaintiffs under 42 U.S.C. § 2000e, et. seq. In such suits, the plaintiffs must establish that [race] discrimination was the company's standard operating procedure." *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000) (citations omitted). Here, Plaintiff does not attempt to make such an assertion in any of the responsive pleadings. Therefore, Defendants' Motion for Summary Judgment as it applies to the claims of pattern or practice discrimination is **due to be GRANTED**.

The Court, therefore, finds that Plaintiff's sole remaining claim is the alleged disparate treatment by Defendants DMH/HR and Searcy Hospital resulting from her termination of employment on October 3, 2003.

### A.     Plaintiff's Claims of Disparate Treatment

In order to support a claim intentional discrimination under Title VII based on disparate treatment "the plaintiff bears the ultimate burden of proving that the employment action at issue was taken because of the plaintiff's [race]." *Joe's Stone Crab, Inc.*, 220 F.3d 1275. Such claims, the Eleventh Circuit has stated, "require proof of discriminatory intent either through direct or circumstantial evidence." *Id*. at 1286. In the instant case, Plaintiff does not submit any direct evidence that "establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Id*. However, it has long been held that absent direct evidence a plaintiff may still establish a prima facie case of disparate treatment via the framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973). Under this paradigm, the plaintiff must demonstrate four factors: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees more favorably; and (4) she was qualified to do the job. *Joe's Stone Crab, Inc.*, 220 F.3d at 1286 (citations omitted). However, once a plaintiff's prima facie case has been established, the defendant has

the burden of proffering a non-discriminatory, legitimate reason for the adverse employment action. *Id*. If such a reason is produced, the burden is then shifted onto the plaintiff to demonstrate that the reason is not legitimate, rather, simply a pretext for unlawful discrimination. *Id*.

### 1. Plaintiff's Prima Facie Case

In regards to the four prong *McDonnell Douglas* standard, Defendants concede that Plaintiff fulfills the first two elements of belonging to a protected class and being subjected to an adverse employment action (here, termination). The remaining two issues, however, Defendants dispute.

#### a. Treatment of Similarly Situated Employees or Replaced by a Person Outside the Protected Class

As already stated, the third prong of the *McDonnell Douglas* test requires that a plaintiff demonstrate that she was treated less favorably than a similarly situated employee outside of her protected class. However, this Circuit has also held that this element may be met when the plaintiff can demonstrate that they were replaced by a person outside the protected class. *Kelliher v. Veneman*, 313 F.3d 1270, 1275 (11th Cir. 2002).

In the instant case, Plaintiff contends that she meets the third standard for establishing a prima facie case because she was replaced by an employee outside of her protected class. In support of this contention, Plaintiff submits that Defendants replaced her with Janet Mitchell, an African American. Though Defendants did hire Mitchell as an Activity Aide after Plaintiff was terminated, the Court finds that this particular "replacement" does not indicate discriminatory intent. Plaintiff was removed from direct patient care duties in CBNF in May of 2003 and was terminated in October of that same year. While Plaintiff was assigned to clerical duties in the Moorer Center, the CBNF closed on August 31, 2003. Therefore, when Plaintiff was fired, the position number for the position she filled reverted back to Searcy Hospital. (Tolbert

Aff. ¶11). Eight months later, in June 2004, the position number was reassigned to an Activity Aide position at Searcy, and was filled on June 28, 2004.[5] *Id*. The eight month lapse of time between Plaintiff's termination and the hiring of Mitchell and the fact that the specialized facility where Plaintiff worked was now closed indicates that Plaintiff, as Tolbert stated in her affadavit, was not functionally or physically replaced. The Court finds that Defendants' hiring of Janet Mitchell was not related to Plaintiff's termination and does not satisfy Plaintiff's burden of demonstrating discriminatory intent.

### b. Plaintiff was Qualified to do the Job

Though the Court finds that Plaintiff has failed to satisfy the third element necessary to establish a prima facie case, we will, nevertheless, complete our *McDonnell Douglas* analysis and examine the final prong.

Plaintiff claims qualification may be based on their actual performance and whether it was at a level which met their employer's legitimate expectations. *Vickers v. Federal Express Co.*, 132 F.Supp.2d 1371, 1379 (S.D. Fla. 2000) (citing *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990).[6] Though Plaintiff cites it in apparent support of its case, the Court in *Vickers* held that the well

---

[5] The Court finds that the position Plaintiff held was at the specialized CBNF and the position Mitchell filled, though titled the same, was essentially a different position because it was at the main Searcy Hospital.

[6] This standard was established by the First Circuit in *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir.1979) and several Circuits have adopted it, however, it is not unanimously accepted. *See,e.g., O'Connor v. Consolidated Coin Caterers Corp.*, 84 F.3d 718, 719 (4th Cir. 1996), *Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 585 (6th Cir. 2002) (accepting this approach, but noting a court must evaluate whether a plaintiff established his qualifications independent of the employer's proffered nondiscriminatory reasons for discharge), *Marinich v. The Peoples Gas Light and Coke Co.*, 45 Fed.Appx. 539, 545 (7th Cir. 2002); *But see Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1505-06 (5th Cir. 1988) (Expressly rejecting the *Loeb* approach as "an unnecessary redundancy.") The Eleventh Circuit has held, "the fourth prong *may* be established by evidence that the plaintiff has performed her responsibilities for several years without complaint."

documented record of infractions cited by the defendant indicates a dissatisfaction with Plaintiff's performance. *Id*. The Court went on to state, "Whether these deficiencies were trumped up ... raises the issue of pretext." *Id*. Similarly, in the instant case, Defendants have presented well documented accounts of Plaintiff's misconduct. Plaintiff was cited by CBNF personnel, both verbally and in writing, for violations of DMH/MR's policy regarding respect for patient dignity and failure to adhere to the no bag/purse safety policy. As noted by both the investigation committee and McLean, these were the reasons she was not returned to direct patient care and ultimately terminated.

Plaintiff, in rebuttal, claims that the unsatisfactory performance appraisals, from which McLean became aware of Plaintiff's misconduct, are useless and fatally flawed because they were prepared in violation of the State's personnel appraisal policy. Defendants admit that the pre-established appraisal policy was not being adhered to at the time of Plaintiff's hiring.[7] Though Defendants' appraisal process was flawed, it does not erase the fact that the incidences of Plaintiff's misconduct existed and are well documented. The Court recognizes that Defendants determine whether or not to terminate an employee at the end of the probationary period based on the score on their probationary performance report. However, there is no indication that Defendants' mis-administration of the probationary process in any way compromised the validity of the scores in a way that was erroneously detrimental to the Plaintiff. Defendants' documentation of Plaintiff's misconduct clearly shows that Plaintiff's performance did not live

---

*Baker v. Sears, Roebuck & Co.*, 903 F.2d 1515, 1520 (11th Cir. 1990) (emphasis added). Absent an express rejection of the *Loeb* standard, the Eleventh Circuit's language indicates that its approach is not exclusive and that there is room for other methods of proving this element.

[7] Upon review, Defendants found that Takarra Craig, who worked as an Activity Aide from October 2002 to June 2003, also had not received a pre-appraisal or mid-appraisal during her probationary period. (Tolbert Affidavit, ¶6).

up to their legitimate expectations. Therefore, the Court finds that Plaintiff has also failed to meet the fourth prong of the *McDonnell Douglas* test necessary to establish a prima facie case.

### 2. Legitimate Reason and Pretext

The Court finds that Plaintiff cannot establish a prima facie case of disparate treatment and our analysis could end there. However, in order to thoroughly address all aspects of the parties' responsive pleadings, we also examine whether Defendants offer a legitimate, non-discriminatory reason for Plaintiff's termination and whether that reason was actually a pretext for discrimination. Defendants submit that Plaintiff was terminated for the legitimate and non-discriminatory reason of failing to meet the standards necessary for permanent employment. More specifically, Plaintiff's prior instances of reprimand led her supervisors to rate her performance as unsatisfactory. Though Plaintiff feels that the performance appraisal process was unfair or incorrect, there is no indication that her poor evaluations were racially motivated. In fact, in her depositions, Plaintiff only claims that poor performance appraisals stemmed from a dispute regarding weekend scheduling. Other than the fact that her supervisors were African-American, Plaintiff has not presented one scintilla of evidence pointing to racial animus as the reason for her termination. Therefore, even if Plaintiff could establish a prima facie case for racial discrimination, the Court finds that she cannot prove that Defendants' otherwise legitimate and non-discriminatory reason for terminating her employment was pretextual.

**CONCLUSION**

Plaintiff has conceded that her claims against Defendants Melcina Russell and Lydia Williams and her claim of Retaliation in violation of Title VII against all Defendants are due to be dismissed. The Court also finds that Plaintiff's claim of a pattern or practice of racial discrimination against Defendants DMH/MR and Searcy Hospital is unsupported in the pleadings. Finally, based on the above facts and analysis, the

Court finds that Plaintiff cannot meet the burden of establishing a prima facie case of Disparate Treatment in violation of Title VII regarding her termination.

Therefore, the Court finds that Defendants' Motion (Doc. 14) for Summary Judgment is **hereby GRANTED**.

**So ORDERED**, this 14th day of June, 2005.

**CLERK IS ORDERED TO CLOSE THIS CASE**.

                                              s/ W. B. Hand
                                        SENIOR DISTRICT JUDGE